Filed 6/26/13  P. v. Binkley CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054436 |
| v. | (Super.Ct.No. FMB900541) |
| JERRY LEE BINKLEY, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Daniel W. Detienne, Judge.  Affirmed.

Wallin & Klarich, Stephen D. Klarich, and Robert C. Kasenow for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Melissa Mandel and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

Defendant Jerry Lee Binkley was charged with the attempted murder of Donald Gulley but found guilty of the lesser offense of attempted voluntary manslaughter, along with assault with a deadly weapon.  (Pen. Code, §§ 664, 192, subd. (a), count 1, § 245, subd. (a)(1), count 2.)[1]  The jury also found that defendant personally inflicted great bodily injury on Gulley in counts 1 and 2 (§ 12022.7, subd. (a)) and personally used a dangerous and deadly weapon, a sword (§ 12022, subd. (b)(1)), in the commission of the attempted voluntary manslaughter.  The evidence showed that the crimes were committed in the aftermath of a road rage incident near Palm Springs on December 3, 2009.

Defendant was sentenced to seven years in prison[2] and appeals, claiming the trial court (1) erroneously refused to discharge Juror No. 2 for good cause based on her prejudicial misconduct; (2) erroneously refused to instruct the jury pursuant to CALCRIM No. 3428 that he suffered from a mental disease or disorder affecting his ability to form the specific intent to commit attempted murder or attempted voluntary manslaughter; and (3) erroneously allowed the prosecution to impeach his trial testimony with two old and factually inapposite misdemeanor convictions.

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

[2]  Defendant's seven-year sentence is comprised of the middle term of three years for the attempted voluntary manslaughter conviction in count 1, plus consecutive terms of three years for the great bodily injury enhancement and one year for the personal use enhancement on count 1.  Additional terms were imposed but stayed on count 2 and the great bodily injury enhancement on count 2.  Defendant was found not guilty of an additional charge in count 3 of vandalism under $400.  (§ 594, subd. (b)(2)(A).)

We find no merit to these claims, and affirm the judgment.

## II.  BACKGROUND

A. *Prosecution Evidence*

On December 3, 2009, Shawn McAlonan met his friend Donald Gulley, a contractor, and members of Gulley's work crew for lunch in Palm Springs.  McAlonan agreed to give a member of Gulley's work crew, Poncho Gutierrez, a ride to Gutierrez's car in McAlonan's truck.  Gutierrez's car was at Gulley's shop across the street from McAlonan's house in Yucca Valley.  Gulley had more stops to make before he returned to his shop.

As McAlonan was halfway through making a left turn onto Sage Road, not far from his home and Gulley's shop, another passenger truck passed him on the left at an excessively high rate of speed.  The posted speed limit was 20 miles per hour, and Sage Road was a dirt road.  Defendant, the driver of the truck that passed McAlonan, stopped in front of McAlonan, opened his door, and put the palms of his hands in the air indicating "come on."

McAlonan testified that he followed defendant down Sage Road "to ask him if he could slow down."  As he followed defendant, he flashed his high beams "possibly several times."  Defendant pulled into a driveway, and McAlonan stopped his truck in the street, but his right front tire was in the driveway.  It was just before dark.

3

As McAlonan rolled down his driver's side window, defendant threw a tire jack into the windshield of McAlonan's truck, smashing the windshield. McAlonan called 911 and Gutierrez called Gulley. A recording of the 911 call was played for the jury.

On the 911 recording, McAlonan is heard telling defendant, "Cops are on their way. I hope you got good insurance," and defendant is heard responding, "I don't give a fuck." Moments earlier, Gulley pulled up and parked his truck and trailer in front of McAlonan, and McAlonan, Gutierrez, and Gulley got out of their vehicles to look at the damage to McAlonan's windshield. Seconds after defendant was heard on the 911 recording saying, "I don't give a fuck," McAlonan told the dispatcher, "[a]nd now he's got a samurai sword." Initially, McAlonan did not feel threatened by the sword because he, Gutierrez, and Gulley were in the street, defendant was "up in his yard," and at that point "it was more yelling than making it physical."

Defendant then began yelling, "Get the fuck out of my yard. Get the fuck out of here," ran "screaming and yelling" down his driveway, and swung the samurai sword at Gulley's head. Gulley put his hand up to block the blow and "cover [his] head," but the sword cut Gulley's hand "in half." If Gulley had not covered his head with his hand, the sword would have struck him in his head or face. Defendant then ran into his house.

When defendant swung the sword at Gulley, Gulley was standing near the driver's side of McAlonan's truck, McAlonan was standing outside of his driver's side door talking to the 911 dispatcher, and Gutierrez was standing near the passenger side of McAlonan's truck, opposite defendant's driveway. Neither Gulley, McAlonan, nor

4

Gutierrez had any weapons. As defendant swung the sword at Gulley, McAlonan saw Gutierrez throw a torque wrench, but McAlonan did not see where the torque wrench landed or whether it struck defendant's truck. Gulley did not see Gutierrez throw anything. Gutierrez's whereabouts were unknown at the time of trial.

Gutierrez drove Gulley to the hospital in Gulley's truck. Gulley estimated that only two minutes passed between the time he pulled up outside defendant's house, surveyed the damage to McAlonan's truck, was struck with the sword, and left for the hospital. Medical personnel initially told Gulley that the rest of his hand would have to be severed, but surgeons at Loma Linda University Medical Center were able to reconnect his hand and its nerves and arteries in a lengthy surgery. Gulley was left with 30 to 40 percent mobility in his hand.

McAlonan lived on Mesa Drive across the street from Gulley, and Gulley lived on the corner of Mesa Drive and Sage Road. McAlonan's and Gulley's houses were approximately 1,000 yards from defendant's house on Sage Road.

Shortly after the incident, San Bernardino County Sheriff's Deputy Wayne Greer interviewed McAlonan at his house. After a police helicopter and officers secured the area around defendant's house, Deputy Greer went to defendant's house, detained defendant in the back of his patrol car, and obtained a statement from defendant after defendant waived his *Miranda*[3] rights. Deputy Greer described defendant as "extremely

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

5

agitated," and testified that defendant had to be calmed down before he could make a statement.

Defendant told Deputy Greer that some people followed him to his house and chased him onto his property. He ran into his backyard and retrieved a samurai sword he kept there, "just in case something like this happens." Fearing the people would harm him, he ran back, swung the sword, and hit someone. There was a blood trail near the edge of defendant's driveway and in the street in front of defendant's house.

Defendant's house was part of a compound surrounded by a fence. Deputy Greer saw that there was extensive damage to defendant's truck, which the deputy found parked inside the compound, behind the fence. The sword, with blood on it, was lying on the hood of one of several vehicles inside the compound. Deputy Greer looked for shoe tracks on the property, but in attempting to clear the scene several other deputies' shoe tracks were in defendant's driveway. One set of shoe tracks led in toward the compound, and another set of shoe tracks led outside of the compound and toward the blood trail at the end of the driveway.

B. *Defense Case*

1. Dr. Michael Kania's Expert Testimony

Clinic forensic psychologist Dr. Michael Kania met with defendant in September 2010 and diagnosed him as having "chronic schizophrenia with paranoid features." The diagnosis was based on defendant's history of hearing voices, delusional and disorganized thinking, and "heightened paranoia" or belief that others were trying to

6

harm him. Defendant's mother had schizophrenia, and studies show that schizophrenia has a genetic component.

Defendant was hospitalized in 1980 and again in 1998 or 1999, and had since been receiving treatment through Morongo Basin Mental Health. There, Dr. Wayne Tevas diagnosed him as having posttraumatic stress disorder (PTSD) and bipolar schizo-effective disorder marked by mood swings and periods in which he became "somewhat paranoid" or fearful and distrustful of other people. Based on his prior diagnoses, defendant was receiving social security disability benefits (SSI) and was incapable of functioning in "a normal job." Defendant's medical records showed that, as early as January 2008, he was treated at Morongo Basin Mental Health for "voices, anger and thoughts of violence," and as recently as October 2009 he was having "random [and] unpredictable" "hallucinations."

Defendant told Dr. Kania that, on December 3, 2009, he drove to the store to buy rolling papers and cigarettes. On his way home, he believed two trucks were following him. The trucks made "unusual movements," and he believed that the people in the trucks intended to kill him. He parked his truck in his driveway so the people in the trucks could not drive onto his property. Three men got out of the trucks; one had a torque wrench. Defendant grabbed a car jack, threw it at the windshield of one of the trucks, ran past the fence on his property, and told his girlfriend to call the police. Defendant then came back out of his house, grabbed the sword, and saw at least one of

the men breaking the windows in his truck. The men came toward him, two to three hundred yards onto his property, and were throwing rocks at him.

According to Dr. Kania, defendant's belief that he was going to be killed by the men in the trucks when he saw them on the road was consistent with his paranoid schizophrenia. Defendant also told Dr. Kania that a person, whom he did not identify by name, was arrested on his property around three years earlier, and ever since that time defendant believed the person was going to come back to his home and harm him.

2. Sara Fitz's Testimony

Defendant's girlfriend, Sara Fitz, was living with defendant on December 3, 2009, and still lived with him at the time of trial in May 2011. Around 5:30 to 6:00 p.m., after defendant returned from a 10-minute trip to the store, Fitz heard defendant outside asking her to call the police. Fitz did not initially call the police because she could not find the telephone. She looked outside and saw two people running up a hill toward the fence on defendant's property, and it looked like the people were going to come into the yard on the near side of the fence. She told the people they had "better get out of here" and she was going to call or had called the police. Someone with a Spanish or foreign accent responded, "fuck you. We're going to get you too."

Defendant walked up to meet the people at the fence and one of them tried to punch and kick him, but Fitz did not see that any punches or kicks landed on defendant. The punches and kicks were being thrown "into the air" because defendant "kept dodging

8

out of the way." One of the men was also throwing rocks at defendant. Four or five times, Fitz heard defendant tell the people to get off the property.

Defendant then went into the compound area of the property and came out with something in his hand. The men then "back[ed] off from the hill," but continued to throw punches and kicks at defendant. Defendant then raised a sword while two of the men were "facing off" against him, and defendant swung the sword "[not] with much force," but with "[j]ust enough force to get him to go away." The man at whom defendant swung the sword ran down the driveway and "charged at" defendant, while another man was on a cell phone and a third man, the one "with the accent . . . might have thrown something."

A couple of minutes after defendant swung the sword at one of the men, all three of the men drove away and Fitz saw that the windows of defendant's truck were smashed. Fitz heard at least two "crashing sounds" when she first looked outside and "[b]efore the men came chasing" after defendant. By the time of trial, Fitz and defendant had discussed the case "hundreds of times."

3. Defendant's Testimony

Defendant testified that he had a long history of mental disorders but had been "feeling really good for several years." He agreed he was "bipolar with PTSD," because his father severely beat him as a child. In December 2009, he was taking Ativan, an antianxiety medication, and using marijuana with a medical marijuana card to treat his bipolar disorder. He had been off probation for 10 years at the time of trial and had since

9

not been in any "major" trouble, "not even a speeding ticket." He had to quit drinking and doing drugs because he was damaging his body and coming down with jaundice.

In 2007, a methamphetamine addict named Michael Kindseth came to defendant's house, pointed a gun at defendant, and threatened to kill him. Defendant called the police, and Kindseth was arrested and sent to prison. After Kindseth pointed the gun at defendant, he drove "back and forth" by defendant's house 10 to 12 times, and would often go to Gulley's house, the house at the end of Sage Road. At one point, a group of "meth addict[]" friends of Kindseth took parts off of defendant's truck, and one of them dropped a "sharp kni[fe]" on the ground as they were running away with a computer they stole out of defendant's truck. Defendant was "confident" Kindseth was going to come back to defendant's house and kill him.

On December 3, 2009, defendant was driving home when he noticed two vehicles were "tr[ying] to stop in front" of him, and he was "pretty sure" it was going to "end up in violence." After he passed the vehicles and had "gotten pas[t] the trap they had set," he slowed his vehicle and raised his hands to gesture "what is this all about?" He sped up and pulled into his driveway, but the other vehicles were right behind him. As he got out of his truck, the other men were getting out of their vehicles.

Defendant saw a Hispanic man, whom he later believed was Gutierrez, get out of the passenger side of one of the vehicles with a 36-inch torque wrench in his hands, so defendant grabbed a bumper jack and threw it through the windshield of the vehicle. Defendant then "ran like hell," and Gutierrez and Gulley chased him up to the fenced

10

area of his yard.  Gutierrez and Gulley then turned, went back to defendant's truck, and began "destroying" it.  Defendant began yelling for Fitz to "call the police," grabbed the sword, and watched to see whether Gutierrez and Gulley would run up into his yard again.  A third man was in the street, talking on a cell phone.

After Gulley and Gutierrez finished destroying defendant's truck, they began "running after" defendant again.  Believing he had no safe place to go, defendant decided to "run at" the two men with his sword.  He "dodged" "at least 30" "deadly strikes" from the men, including thrown rocks, punches, kicks, and blunt objects.  He swung the sword "in a defensive manner" for around two minutes.  Gulley then "ran at" and "charged" defendant, and defendant cut Gulley with the sword.

Defendant thought Gulley had a weapon in his hand; otherwise he did not believe Gulley would have charged at him given that he was swinging the sword.  When defendant struck Gulley with the sword, he and Gulley were near the front of defendant's truck, parked in the driveway.  Gulley "tried not to bleed in the yard" and "tried to make the blood trail more towards the street."  Defendant was in fear for his life when he struck Gulley with the sword.

After Gulley, Gutierrez, and the third man left the scene, defendant called 911 but either misdialed or mistakenly hung up the telephone. The 911 dispatcher called defendant back and asked whether there was a problem there.  A recording of the 911 call was played for the jury.  In the recording, defendant is heard telling the dispatcher that someone was bothering him, pulled into his yard, was breaking his windows, and began

11

attacking him. Defendant "ran inside," and got "a knife, a sword," and "cut one of them but they left." He told the dispatcher not to worry about sending any officers to his house because the men were already gone. He was agitated during the call, said he was "really . . . confused," and denied he was injured.

On cross-examination, defendant said he believed the three men who followed him to his house were going to kill him because Kindseth had encouraged or paid them to do so. Defendant used to see Kindseth going to Gulley's house on the corner around twice each week, defendant believed, to deliver or pick up drugs. After Kindseth threatened defendant in 2007, defendant called the police but conceded there was no record of his call or of anyone named Kindseth being arrested or incarcerated for threatening him.

Defendant believed Gulley and Gutierrez were in the first truck that arrived at his house, and McAlonan was in the second vehicle that arrived "very shortly [there]after." When asked whether he believed it was wise for McAlonan to be calling 911 while two of his friends were trying to kill defendant, defendant said "[y]es, because they are covering their own asses," or "trying to do kind of a smoke screen[.]" The headlights of both vehicles were turned off before Gutierrez and Gulley began throwing rocks and before "anything else happened[.]"

Defendant denied he intended to kill Gulley when he swung the sword at him but admitted he was trying to hit Gulley in the head or face with the sword. He was frightened and believed he was in grave danger, but he was happy when he saw Gulley was not dead. He did not want to kill Gulley; he only wanted the violence to stop. He

12

was "pretty sober" at the time of the December 3, 2009, incident, and had stopped using methamphetamine in July 2007. When he was on methamphetamine in the past and had not slept for several days, he would see things that were not there and he was unable to see things that were "right in front" of him.

Defendant conceded that over 10 years before trial he was convicted of "a spousal battery and a battery," both misdemeanors. He had not been on probation for these crimes in approximately 10 years.

C. *Prosecution Rebuttal Evidence*

In 2002, a computerized records management system called Tiberon was installed at the Morongo Basin station of the San Bernardino County Sheriff's Department. The system was able to generate a list of 911 and other "calls for service" to law enforcement from specific addresses. According to the system, no 911 or other service calls concerning anyone named Kindseth were made from defendant's house from January 1, 2006, through the time of trial in May 2011.

### III.  DISCUSSION

A. *The Court Properly Refused to Discharge Juror No. 2 for Cause Based on Her Discussion of the Victim, Donald Gulley, With Her Neighbors*

Defendant claims the court abused its discretion and violated his right to a trial by 12 fair and impartial jurors in refusing to dismiss Juror No. 2 for cause based on her discussion with her neighbors concerning whether the victim, Donald Gulley, was someone the neighbors knew and the juror had seen once or twice before at an auction.

13

We find no abuse of discretion.  Based on the entire record, there is no substantial likelihood that Juror No. 2's receipt of information concerning Gulley compromised her ability to be fair and impartial.

1.  Background

On the first day of trial and before the first witness, Alonan, testified, Juror No. 2 told the bailiff she now recognized the name "Gulley" on the witness list, though when she was asked during voir dire she did not realize she was familiar with Gulley and did not recognize his name.  The court took up the matter with counsel outside the presence of the other jurors, and asked Juror No. 2 to explain how she came to realize she knew or was familiar with Gulley.

Juror No. 2 explained she was having coffee with her neighbor "as usual on Thursday," and told the neighbor she had jury duty after the neighbor asked why she had not seen Juror No. 2's car recently.  The neighbor then asked, "what kind of a case?," and Juror No. 2 said, "attempted murder."  The neighbor's husband then asked, "[I]t is not Don, is it?," and Juror No. 2, responded, "who is Don?," having "no idea" who the husband was talking about.

Juror No. 2 then explained that Gulley worked at an auction she occasionally attended.  She did not know Gulley personally and had never socialized with him, but may have spoken to him a couple of times.  She did not think her familiarity with Gulley would have any bearing on the case, but she thought she should bring the matter to the

14

court's attention. She had not been to the auction in six months and had never conducted any auction-related or other business transactions with Gulley.

In response to defense counsel's questions, Juror No. 2 said her neighbors knew Gulley, she did not know *how well* they knew him, but her neighbors attended the auction "all the time" and knew "just about everybody" who worked there. She used to attend the auction, "Pope Auctions" in Yucca Valley, around once each month but had not attended in approximately six months. When asked whether she spoke to her neighbors about the case in order to let them determine whether the "Don" from the auction was the same "Don" the neighbors were asking about, Juror No. 2 responded, "*Not that I recall, no.*" (Italics added.)

Defense counsel moved to excuse Juror No. 2 and replace her with an alternate juror on the grounds she was not following the court's admonition not to discuss the case; her neighbors were apparently good friends with Gulley because they referred to him on a first name basis; and Juror No. 2 had seen Gulley in the past and still saw him on occasion. Defense counsel said he would have peremptorily excused Juror No. 2 had he known of her association with Gulley, which was "simply too close for comfort" for the defense. The prosecutor submitted the matter to the court's discretion, and the court denied the motion.

Later during the first day of trial, defense counsel renewed his request to remove Juror No. 2, telling the court he had researched "Pope Auctions" over the lunch hour and, if Juror No. 2 attended the auction to buy or sell things, she must have had some type of

15

business relationship with Gulley and that was sufficient to "raise an issue of implied bias." Again the court found insufficient grounds to remove Juror No. 2.

Later during trial, while Gulley was testifying, the court told the prosecutor and defense counsel that it wanted to ask Juror No. 2 more questions about what she and her neighbors discussed concerning "Don's case." In response to the court's additional questions, Juror No. 2 explained she did not recognize the Don Gulley who testified but may have seen him once or twice at the auction. When her neighbors asked her whether she was a juror on "Don's case," they tried to describe "Don" to her, and at the time she thought they were talking about someone other than the Don Gulley who later testified. She affirmed that nothing about her conversation with her neighbors or the fact she may have seen Gulley before would impact her ability to be fair.

The court said, "I think that takes care of that issue," and asked defense counsel whether he had any comments. Again, defense counsel asked the court to dismiss Juror No. 2 on the grounds she committed misconduct by discussing the case with her neighbors and because she appeared to be minimizing the extent she discussed the case— and who "Don" was—with her neighbors. The prosecutor pointed out that defense counsel's argument was based on speculation, and submitted that based on Juror No. 2's conduct and statements there was no reason to believe she could not be fair and impartial. After discussing additional case law with the prosecutor and defense counsel, the court again denied defendant's request to dismiss Juror No. 2. Defendant later moved for a

16

new trial based, in part, on the alleged prejudicial misconduct of Juror No. 2, and the motion was denied.

2. Analysis

A criminal defendant has a constitutional right to a trial by impartial and unbiased jurors. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; *People v. Roldan* (2005) 35 Cal.4th 646, 689; *In re Carpenter* (1995) 9 Cal.4th 634, 652.) "'The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to trial by jury guaranteed by the Constitution.' [Citations.]" (*Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 110.) And because a defendant also has a right to the unanimous verdict of 12 impartial jurors, "'"a conviction cannot stand if even a single juror has been improperly influenced."'" (*In re Carpenter, supra,* at p. 652; *People v. Holloway* (1990) 50 Cal.3d 1098, 1112.)

Section 1089 authorizes the trial court to discharge a juror before the jury reaches its verdict if the court, upon good cause, finds the juror "unable to perform his or her duty." (§ 1089; *People v. Lomax* (2010) 49 Cal.4th 530, 565.) A juror's misconduct constitutes good cause to discharge the juror under section 1089 only if the misconduct is "'serious and wilful.'" (*People v. Bowers* (2001) 87 Cal.App.4th 722, 729; *People v. Daniels* (1991) 52 Cal.3d 815, 864.)

It is misconduct for a juror to discuss the case with a nonjuror during the course of the trial. (*People v. Danks* (2004) 32 Cal.4th 269, 304; *People v. Pierce* (1979) 24 Cal.3d 199, 207.) And juror misconduct, "'or a nonjuror's tampering contact or communication

17

with a sitting juror, *usually* raises a rebuttable "presumption" of prejudice.'" (*People v. Danks, supra,* at p. 302, italics added.) Still, reversal is required "only if there appears a substantial likelihood of juror bias," i.e., prejudice. (*Id*. at p. 303.)

Here, it cannot be said that Juror No. 2 engaged in misconduct in telling her neighbors that she was a juror on an "attempted murder" case, or in trying to ascertain whether, unbeknownst to herself, she was acquainted with Don Gulley, a witness and the victim in the case. First, Juror No. 2's response to her neighbors that she was a juror on an "attempted murder" case did not violate the court's admonition not to discuss the case or "the facts" of the case. Second, Juror No. 2 cannot be faulted for attempting to ascertain whether she was familiar with Gulley when her neighbors thought she was or might be. If it were later discovered that Juror No. 2 was familiar with Gulley, it would have appeared that Juror No. 2 had been hiding her acquaintance or familiarity with Gulley and was biased in favor of Gulley and against defendant. (*In re Hitchings* (1993) 6 Cal.4th 97, 120 [juror's concealment of material information on voir dire establishes grounds for inferring juror was biased, and creates inference of prejudice].)

But even if it can be said Juror No. 2 engaged in misconduct in telling her neighbors that she was serving as a juror on an "attempted murder" case, or in discussing Gulley's identity with her neighbors, the misconduct was by no means prejudicial. Thus, reversal is unwarranted. Whether prejudice arose from juror misconduct is a mixed question of law and fact subject to an appellate court's independent determination. (*People v. Danks, supra,* 32 Cal.4th at pp. 302-303.) We accept the trial court's

18

credibility determinations and findings of historical fact if substantial evidence supports them. (*Id*. at pp. 303-304; *People v. Nesler* (1997) 16 Cal.4th 561, 582.)

The standard for determining prejudice, or a substantial likelihood of juror bias, is well established. (*People v. Danks, supra,* 32 Cal.4th at p. 303.) When the alleged misconduct "'involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways.' [Citation.] [¶] 'First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror.' [Citation.] 'Under this standard, a finding of "inherently" likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment. Application of this "inherent prejudice" test obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information.' [Citation.]

"Second, 'even if the extraneous information was not so prejudicial, in and of itself, as to cause "inherent" bias under the first test,' the nature of the misconduct and the 'totality of the circumstances surrounding the misconduct must still be examined to determine objectively whether a substantial likelihood of actual bias nonetheless arose.' [Citation.] 'Under this second, or "circumstantial," test, the trial record is not a dispositive consideration, but neither is it irrelevant. All pertinent portions of the entire

19

record, including the trial record, must be considered. "The presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, *upon examining the entire record*, that there is no substantial likelihood that the complaining party suffered actual bias."' [Citation.]" (*People v. Danks, supra,* 32 Cal.4th at p. 303; *In re Carpenter, supra,* 9 Cal.4th at pp. 653-654.)

Here, there is no substantial likelihood of bias under either test. First, we observe that the court found Juror No. 2's representations concerning the content and extent of her conversation with her neighbors to be credible in part because she brought the matter to the court's attention in the first place. As noted, we are bound by the trial court's credibility determination. (*People v. Nesler, supra,* 16 Cal.4th at p. 582.)

Under the first test, the extraneous information that Juror No. 2 received from her neighbors about Gulley—that her neighbors knew him and that she may have spoken to him once or twice at the auction more than six months before trial—was not, "judged objectively, . . . inherently and substantially likely to have influenced" or biased Juror No. 2 against defendant. (*In re Carpenter, supra,* 9 Cal.4th at p. 653.) As Juror No. 2 told the court and counsel, she did not know Gulley personally; she had never socialized with him; and she had never conducted any business transactions with him. At most, she *may have* spoken to him once or twice before at the auction she had not attended in six months. She said she could be fair and impartial, and nothing about her conversation with her neighbors or her possible association with Gulley in the past affected her ability to be fair and impartial.

Nor do any of the circumstances surrounding the alleged misconduct indicate a substantial likelihood of bias under the second test. (*In re Carpenter, supra,* 9 Cal.4th at p. 653.) Juror No. 2 did not initiate the conversation about Gulley with her neighbors. Instead, the conversation began when her neighbors asked why they had not seen her car, and she told them she was on jury duty. When asked what kind of case, she responded, "attempted murder," and when asked whether it was "Don's case," she said she had "no idea" who Don was. She and her neighbors then discussed "who Don was" so she could ascertain whether she knew or remembered the Don Gulley the neighbors knew. Given these circumstances, together with Juror No. 2's prompt reporting of her conversation to the court and her assurances that she could be fair and impartial, there is no substantial likelihood that Juror No. 2 was biased against defendant.

Defendant points out that Juror No. 2 was apparently close to her neighbors, and her neighbors apparently knew Gulley well because they were on a first name basis with him. On this basis, defendant argues Juror No. 2 must have had a more extensive conversation with her neighbors than she represented to the court and counsel, and this supports a substantial likelihood Juror No. 2 was biased. But as the prosecutor pointed out, the claim that Juror No. 2 was biased simply because her neighbors were friends with Gulley is based on speculation and disregards what Juror No. 2 said. Juror No. 2 said she did not know *how well* her neighbors knew Gulley, and even if her neighbors knew Gulley well and were friends with him, Juror No. 2 *did not know* him. There is no basis to infer that Juror No. 2 was biased against defendant simply because her neighbors knew

21

him.  (See *People v. Ray* (1996) 13 Cal.4th 313, 344 [no evidence of juror bias where the juror worked at the same high school attended by victim's daughter, and there was no indication the juror had worked with the victim's daughter at the school or had "special feelings" toward the victim's family].)

Defendant's reliance on *People v. Abbott* (1956) 47 Cal.2d 362 (*Abbott*) to support his claim of prejudice is also unavailing.  The trial court in *Abbott* discharged a juror after it discovered he worked in the same office as the defendant's brother, at a desk only 25 feet away from the brother.  (*Id*. at pp. 370-371.)  The court said it was discharging the juror due to his proximity in the office to the brother, and even though the juror told the court he did not know the brother and had not discussed the case with him, there were other people in the office who knew both men.  (*Id*. at p. 371.)  The *Abbott* court concluded that the trial court did not abuse its discretion in finding good cause to discharge the juror.  (*Ibid*.; § 1089.)

*Abbott* is distinguishable from the present case in part because the discharged juror's relationship with the brother was discovered by the court, who directed the sheriff to investigate the matter during the trial, and not because the juror brought the matter to the court's attention.  (*Abbott, supra,* 47 Cal.2d at p. 370.)  As indicated, Juror No. 2 brought her possible prior contacts with Gulley to the court's attention after she and her neighbors discussed the matter.  Moreover, *Abbott* is distinguishable because there was ample reason to believe the discharged juror could *not* be fair and impartial, not only because he worked in close proximity to the defendant's brother, but because there were

22

people in the office who knew both men, and the juror *expressed the opinion to another person in the office that he believed the defendant had been framed*. (*Ibid*.) Juror No. 2 expressed no opinion about the case to anyone. Unlike the juror in *Abbott*, there is no substantial likelihood that Juror No. 2 was biased.

B. *The Court Properly Refused to Instruct the Jury Pursuant to CALCRIM No. 3428 That Defendant's Mental Diseases Prevented Him from Forming an Intent to Kill Gulley*

Defendant claims the court erroneously refused his request to instruct the jury pursuant to CALCRIM No. 3428 (Mental Impairment: Defense to Specific Intent or Mental State (Pen. Code, § 28)) or a similar instruction, that it could consider the evidence he suffered from mental illnesses or impairments in determining whether he acted or failed to act with the specific intent to commit attempted murder or attempted voluntary manslaughter at the time he swung the sword at Gulley. We conclude the instruction was properly refused because, as the trial court concluded, there was insufficient evidence that defendant's mental illnesses or impairments had any bearing on his ability to form the specific intent to kill Gulley when he swung the sword at Gulley.

Attempted murder, the crime charged in count 1, and the lesser included offense of attempted voluntary manslaughter, of which defendant was convicted in count 1, require specific intent to kill. (*People v. Van Ronk* (1985) 171 Cal.App.3d 818, 824-825.) Though the defense of diminished capacity has been abolished in California (§ 25), evidence that the defendant had a mental disease, mental defect, or mental disorder is

23

admissible "solely on the issue of whether or not *the accused actually formed a required specific intent . . .* when a specific intent crime is charged." (§ 28, italics added.)

Still, an expert testifying about a defendant's mental illness, disorder, or defect in the guilt phase of a criminal trial may not render an opinion on the issue of whether the defendant actually did or did not harbor the intent required to commit the charged crime. (§ 29; *People v. Coddington* (2000) 23 Cal.4th 529, 582-583 [expert cannot opine that the defendant did or did not have the required criminal intent, but only to existence ***vel*** *non* of a mental disease, disorder, or defect]; see also *People v. Cortes* (2011) 192 Cal.App.4th 873, 902-909 [discussing extent of expert testimony admissible under §§ 28 & 29].) Whether the defendant did or did not have the requisite criminal intent to commit the specific intent crime is for the jury to determine—without the aid of an expert opinion on the question. (§ 29; *People v. Coddington*, *supra,* at pp. 582-583.)

CALCRIM No. 3428 reflects these principles. It provides: "You have heard evidence that the defendant may have suffered from a mental (disease[,]/ [or] defect[,]/ [or] disorder). You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with the required intent or mental state, specifically: _____ *<insert specific intent or mental state required . . . .>*"

24

The trial court is not required to give CALCRIM No. 3428 sua sponte, but only on the request of the defense (*People v. Saille* (1991) 54 Cal.3d 1103, 1119) *and* only if "there is evidence supportive of the theory" (*ibid*)—that is, only if substantial evidence shows that the defendant's mental disease, disorder, or defect affected his or her "formation of the relevant intent or mental state" to commit the specific intent crime charged (*People v. Larsen* (2012) 205 Cal.App.4th 810, 823-824; § 28).

Here, the trial court refused to give CALCRIM No. 3428 on the ground there was insufficient evidence to support the instruction. The trial court was correct.

To be sure, abundant evidence was presented through the testimony of the defense expert, clinical forensic psychologist, Dr. Kania, and through defendant's own testimony that defendant suffered from a number of mental diseases and disorders. Dr. Kania believed defendant suffered from "chronic schizophrenia with paranoid features" based on his history of hearing voices, delusional and disorganized thinking, and "heightened paranoia" or belief that others were trying to harm him. Still, defendant was not experiencing any hallucinations or suffering from any "clearly identified delusion" when Dr. Kania diagnosed him in September 2010. And although defendant showed some signs of having disorganized thought processes, this symptom was present "to a . . . lesser degree" at the time of the diagnosis.

Defendant had been receiving mental health treatment through Morongo Basin Mental Health for several years before December 2009. There, Dr. Tevas diagnosed him with PTSD and bipolar schizo-effective disorder, marked by mood swings and periods in

25

which he became "somewhat paranoid" or fearful and distrustful of other people. Finally, in testifying in his own defense, defendant agreed he was bipolar and suffered from PTSD, but indicated he did not believe he suffered from schizophrenia. In December 2009, he was taking Ativan, an antianxiety medication, and using marijuana with a medical marijuana card to treat his bipolar disorder. At the time of trial in May 2011, defendant said he had been "stable lately," and "feeling really good for several years."

Notwithstanding the evidence that defendant suffered from a number of mental diseases or disorders at the time of the December 3, 2009, incident (i.e., PTSD, bipolar disorder, schizophrenia), there was no evidence that any of these conditions affected his ability to form the specific intent to kill Gulley when he swung the sword at Gulley. As the trial court pointed out in refusing to give CALCRIM No. 3428, Dr. Kania "never said anything even remotely to indicate the defendant was incapable of actually forming the specific intent to kill."

To be sure, Dr. Kania testified that defendant's irrational belief that the men he saw driving in front of him on Sage Road were going to kill him was consistent with his schizophrenia with paranoid features. But when asked whether "the rest of" defendant's actions during the incident were consistent with the diagnosis, Dr. Kania responded, "Not necessarily, no." Dr. Kania also indicated that defendant's actions during the incident were a rational response to the situation he believed he was facing: three men who had been sent to his house to kill him.

26

In addition, defendant's own testimony showed he was well aware of what was happening and what he was doing during the December 3, 2009, incident, including when he swung the sword at Gulley's head. In exacting detail, defendant described what occurred from the time he saw the two trucks in front of him on Sage Road through the time sheriff's deputies arrived at his home—including what was happening when he swung the sword at Gulley. Nothing in defendant's testimony indicated he was suffering from any delusions, hallucinations, or even disorganized thought processes when he swung the sword at Gulley.

To the contrary, defendant testified he had been "stable lately," and "feeling really good for several years." He also admitted he "[p]robably" would have struck Gulley in the head with the sword had Gulley not put his hand up to block the blow. And even though defendant claimed he only wanted to "stop" Gulley and not kill him, nothing in his testimony indicated that any of his mental diseases or disorders affected his ability to form the specific intent to kill.

In sum, based on all of the evidence, the trial court correctly concluded that there was insufficient evidence to support giving CALCRIM No. 3428. Indeed, as the trial court said, giving the instruction would have been like "asking the jury to decide something based on worse than speculation, based on something that would fly in the face of the evidence that was presented."

27

C. *Defendant Was Properly Impeached With Evidence of His Two Prior Misdemeanor Convictions*

Lastly, defendant claims the court abused its discretion in allowing the prosecution to impeach his trial testimony with two prior misdemeanor convictions, a 1999 conviction for domestic violence or "spousal abuse," and a 2000 conviction for making criminal threats. He claims the convictions were too remote in time and too dissimilar to the charged offenses to be admissible under Evidence Code section 352. He also claims his defense counsel rendered ineffective assistance in failing to object to the admission of the misdemeanor "convictions" on hearsay grounds. We find no abuse of discretion by the trial court and no prejudicial ineffective assistance on the part of defense counsel.

We first address defendant's claim that his counsel rendered prejudicial ineffective assistance in failing to object to the admission of the 1999 and 2000 misdemeanor convictions on hearsay grounds.[4]

---

[4] We apply the following standard in considering defendant's claim of ineffective assistance of counsel: "'To establish entitlement to relief for ineffective assistance of counsel the burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings. [Citation.] "[W]here the record shows that counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed." [Citation.] "In some cases, however, the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide one or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal." [Citation.]'" (*People v. Shea* (1995) 39 Cal.App.4th 1257, 1265.)

1.  Background

The prosecutor briefly mentioned the two prior misdemeanor convictions in cross-examining defendant:

"[PROSECUTOR:]  You were convicted of a criminal threat in . . . .

"[DEFENDANT:]  Yes, I was.

"[PROSECUTOR:]  And the year before that you were also convicted of spousal abuse; correct?

"[DEFENDANT:]  Yes, sir, I was.

"[PROSECUTOR:]  Had you been convicted of anything else . . . since then?

"[DEFENDANT:]  No, I have been in good shape.  I've been doing really good ever since then.  It was just a bad mishaps.

"[PROSECUTOR:]  Two bad mishaps?

"[DEFENDANT:]  A bad mishap."

On redirect examination, defense counsel led the following colloquy:

"[DEFENSE COUNSEL:]  You indicated that you have previously been convicted of a spousal battery and a battery.  Do you know what years those occurred?

"[DEFENDANT:]  They were over a decade ago.

"[DEFENSE COUNSEL:]  Those were misdemeanors; correct?

"[DEFENDANT:]  Yes, sir.

"[DEFENSE COUNSEL:]  In fact, during your either direct or cross examination you indicated you hadn't been on probation for 10 years.  Are those the misdemeanor cases that you were on probation for?

"[DEFENDANT:]  Yes."

As defendant points out, "[m]isdemeanor convictions . . . are not admissible for impeachment, although evidence of the underlying *conduct* may be admissible subject to the court's exercise of discretion."  (*People v. Chatman* (2006) 38 Cal.4th 344, 373; see also *People v. Wheeler* (1992) 4 Cal.4th 284, 295-299.)  This is because asking a witness whether he or she suffered a *prior misdemeanor conviction,* as opposed to asking the witness whether he or she committed *the conduct* underlying the conviction, calls for inadmissible hearsay.  (*People v. Cadogan* (2009) 173 Cal.App.4th 1502, 1514-1515 & fn. 4; *People v. Wheeler, supra,* at pp. 298-299.)[5]

---

[5]  As explained in *Cadogan*:  "Evidence Code section 788 states:  'For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony . . . .'  There is no similar section in the Evidence Code specifically authorizing misdemeanor convictions to be utilized by way of cross-examination for the purpose of impeaching a witness.  Evidence Code section 452.5, subdivision (b), enacted in 1996, provides:  'An official record of conviction certified in accordance with subdivision (a) of [Evidence Code] Section 1530 is admissible pursuant to [Evidence Code] Section 1280 to prove the commission, attempted commission, or solicitation of a criminal offense, prior conviction, service of a prison term, or other act, condition, or event recorded by the record.'  Thus, this section 'creates a hearsay exception allowing admission of qualifying court records to prove not only the fact of conviction, but also that the offense reflected in the record occurred.'  (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1460 . . . .)  But in the case before us, the prosecutor attempted to impeach defendant by eliciting hearsay testimony about a prior conviction, a form of evidence not excepted from the hearsay rule by Evidence Code section 452.5, subdivision (b)."  (*People v. Cadogan, supra,* 173 Cal.App.4th at p. 1515, fn. 4.)

30

Nonetheless, there appears to be a satisfactory explanation for why defense counsel did not object on hearsay grounds when the prosecutor asked defendant whether he had been "convicted" of "a criminal threat" and "spousal abuse." (*People v. Shea, supra,* 39 Cal.App.4th at p. 1265 [no entitlement to relief for ineffective assistance of counsel shown where record shows counsel's omission resulted from informed tactical choice within the range of reasonable competence].) Had defense counsel made the objection, the prosecutor could have asked defendant more probing questions concerning the conduct underlying the prior criminal threat and spousal abuse convictions. That may have damaged defendant's credibility more forcefully than the prosecutor's very brief references to the two prior convictions.

In addition, the prosecutor's references to two prior "convictions" allowed defense counsel to emphasize on redirect that the convictions were for misdemeanors, occurred more than 10 years earlier, and that defendant had not been on probation for many years.

For the same reasons defense counsel had a tactical reason for not objecting to the misdemeanor "conviction" questions, it is not reasonably probable defendant would have realized a more favorable result had defense counsel objected to the questions on hearsay grounds. (*People v. Shea, supra,* 39 Cal.App.4th at p. 1265.) Again, the prosecutor's references to the "convictions" was brief, did not emphasize the conduct underlying the convictions, and allowed defense counsel to rehabilitate defendant's credibility by emphasizing that the convictions were for misdemeanors, were over 10 years old, and that defendant had not been on probation for many years.

2.  The Prior Conviction Evidence Was Properly Admitted

"A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352."[6] (*People v. Clark* (2011) 52 Cal.4th 856, 931, fn. omitted; *People v. Wheeler, supra,* 4 Cal.4th at pp. 290-296.)  Because the court's discretion to admit or exclude relevant impeachment evidence under Evidence Code section 352 "'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion [citations]." (*People v. Clark, supra,* at p. 932.)

The trial court's discretion to admit relevant impeachment evidence is governed by several guiding principles.  Specifically, "[w]hen determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify.  [Citations.]" (*People v. Clark, supra,* 52 Cal.4th at p. 931, quoting *People v. Beagle* (1972) 6 Cal.3d 441, 453.)

Defendant concedes that his 1999 and 2000 misdemeanor convictions for domestic violence and making criminal threats involved moral turpitude, suggesting "a willingness

---

[6] Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

to lie." (*People v. Wheeler, supra,* 4 Cal.4th at p. 295.) He argues, however, that both convictions were too remote in time and too similar in nature to the charged offenses to be admissible under Evidence Code section 352. We disagree that the presence of these factors required the exclusion of the misdemeanors under Evidence Code section 352.

To be sure, the 1999 and 2000 convictions were 12 and 11 years old, respectively, at the time of trial in May 2011. But as the court pointed out, both convictions involved crimes of moral turpitude, and defendant was "not particularly young" when he suffered the convictions. He was born in 1963 and was in his late 30's in 1999 and 2000. Given defendant's age when he committed the crimes underlying the 1999 and 2000 convictions, the convictions were not too remote in time to be admitted for impeachment purposes.

The record also shows that defendant had three other, and older, misdemeanor convictions: a 1981 conviction for battery (§ 242); a 1983 conviction for resisting, delaying, or obstructing an officer (§ 148); and a 1990 conviction for soliciting or engaging in prostitution (§ 647, subd. (b)). These additional convictions showed that the 1999 and 2000 convictions were not isolated incidents, but part of a pattern of crimes involving moral turpitude. It is settled that a series of crimes is more probative of credibility than "a single lapse." (*People v. Hinton* (2006) 37 Cal.4th 839, 888; *People v. Green* (1995) 34 Cal.App.4th 165, 183.) Thus, defendant's three older convictions bolstered the probative value of his 1999 and 2000 convictions for impeachment purposes, even though the jury did not hear about the older convictions.

As the trial court also pointed out, the 1999 and 2000 misdemeanor convictions were not "overly prejudicial because they are misdemeanors" and because they did not involve the "exact same" charges as the present case. Indeed, the 1999 and 2000 convictions were probative of defendant's general credibility, but not unduly prejudicial because they involved domestic violence and criminal threats, not the more serious crimes of attempted murder, the lesser offense of attempted voluntary manslaughter, and assault with a deadly weapon—the crimes charged in the present case. (*People v. Hinton, supra,* 37 Cal.4th at p. 888 [similarity of prior convictions to charged crimes is no longer dispositive of their admissibility].)

Finally, the jury was instructed to consider the prior convictions only in evaluating the credibility of defendant's testimony, and based on the entire record, excluding the 1999 and 2000 convictions would have given defendant a "'false aura of veracity.'" (*People v. Tamborrino* (1989) 215 Cal.App.3d 575, 590.) In sum, for the reasons the court articulated, the 1999 and 2000 misdemeanor convictions were not unduly prejudicial and were properly admitted for impeachment purposes.

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
Acting P. J.

We concur:

MILLER
J.

CODRINGTON
J.

35